In the Matter of the WELFARE OF S.Z.

No. C0–95–763.

Supreme Court of Minnesota.

May 23, 1996.

William R. Kennedy, Hennepin County Public Defender and Renee Bergeron, Assistant Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney and Andrew J. Mitchell, Assistant County Attorney, Minneapolis, for respondent.

Andrea K. Niemi and John M. Jerabek, Niemi & Barr, P.A., Minneapolis, for guardian ad litem.

## OPINION

ANDERSON, Justice.

Appellant Jeffrey Scott Nichols challenges a determination of the Hennepin County District Court terminating his parental rights to his son, S.Z. The court terminated Nichols' parental rights on three statutory grounds: repeated neglect to comply with parental duties; palpable unfitness to be a party to the parent and child relationship; and because S.Z. was neglected and in foster care. On appeal, the Minnesota Court of Appeals affirmed the termination on one of the three grounds: palpable unfitness. Nichols appeals, alleging that it was error to terminate his parental rights when no services were offered to rehabilitate him as a parent and to reunite him with S.Z. We affirm.

S.Z. was born on June 6, 1993, and ten days later an Order for Immediate Custody and a Child in Need of Protection and Services (CHIPS) Petition regarding S.Z. was filed in the juvenile division of the Hennepin County District Court. S.Z. was removed from his mother's custody on that date and placed in foster care. On August 21, 1993, S.Z. was found to be a child in need of protection or services because, among other things, S.Z. was without proper parental care due to the emotional, mental, or physical disability, or state of immaturity of his parents. Interim legal custody of S.Z. was transferred to the Hennepin County Department of Children and Family Services (Hennepin County).

In September 1993, appellant Jeffrey Scott Nichols, S.Z.'s father, contacted Hennepin County to request a case plan and visitation schedule with S.Z. Nichols was informed by a social worker that he first must establish his paternity of S.Z. and on November 13, 1993, Nichols signed papers to this effect. Nichols asserts that even after he acknowledged that he is S.Z.'s father, Hennepin County refused to offer him any rehabilitation or reunification services.

On January 24, 1994, Hennepin County filed a petition seeking to terminate both Nichols' and S.Z.'s mother's parental rights pursuant to Minn.Stat. § 260.221. S.Z.'s mother's parental rights were terminated on May 13, 1994. Nichols, who was committed to St. Peter Regional Treatment Center (St. Peter) in January 1994, sought continuance of his termination hearing until he was discharged from St. Peter and had time to prepare a response to the petition. The court granted Nichols' request for a continuance. Nichols was discharged from St. Peter on August 8, 1994, the termination hearing was held on November 29, 1994, and on March 8, 1995, his parental rights to S.Z. were terminated.

The district court terminated Nichols' parental rights in large part because of his long history of chemical dependency and mental illness. While in high school, Nichols was hospitalized for chemical dependency treatment on two occasions. From the late 1970's to the mid–1980's, he lived intermittently at home and in halfway houses and had a number of hospitalizations for psychiatric treatment, including three commitments to Anoka Metro Regional Treatment Center (Anoka) between 1987 and 1989. In 1984, while intoxicated, Nichols jumped off the Tenth Avenue bridge in Minneapolis. After that incident, he was subject to a stayed commitment order and lived at a halfway house. During treatment at the halfway house, Nichols received drug therapy with Prolixin, an antipsychotic, and other drugs.[1]

On August 19, 1993, Nichols was admitted to Hennepin County Medical Center for the 16th time, after police found him sleeping in an alley and believed he had been using drugs. Hennepin County Medical Center's clinical data sheet indicated that he was at chronic risk of self-injurious behavior. During the August 19, 1993 admission to Henne-

---

1. While at the halfway house, Nichols met S.Z.'s mother and they began a relationship. The two became parents of their first child in 1986, but their parental rights to that child were terminated in 1989.

pin County Medical Center, Nichols refused medication, was extremely guarded and suspicious and refused to interact with the staff. On August 29, 1993, a psychiatrist recommended that Nichols be committed to a regional treatment facility because he suffered from a substantial psychiatric disorder and exhibited behaviors such as paranoid thinking, auditory hallucinations, socially isolative behavior, irritability, sleeping on the streets, a history of suicide attempts, and an inability to think realistically regarding his future.

In September 1993, Nichols was committed to Anoka as mentally ill. The committing court found that Nichols was ill with chronic schizophrenia, and that as a consequence of his mental illness, he had engaged in grossly disturbed behavior and posed a substantial likelihood of causing physical harm because he was delusional, threatening toward others, and unable to provide for his own needs. The court stayed the commitment order on specific conditions, including that Nichols remain at Hennepin County Medical Center, take all prescribed medications, refrain from the use of alcohol and other nonprescribed drugs, cooperate with his social worker, and adhere to his aftercare plan. Nichols did not comply with the conditions of the stayed commitment order and was unable to stop drinking. He went to the Crisis Intervention Center in December, stated that he was suicidal, and talked about jumping off a bridge. The next day, the police took Nichols to Hennepin County Medical Center because he again threatened to kill himself by jumping off a bridge. On December 16, he returned to the Crisis Center after he attempted suicide by cutting his wrists. In January 1994, the court revoked the stay of commitment, and committed Nichols to Anoka.

At the time Hennepin County petitioned to terminate his parental rights, Nichols was in the Hennepin County Medical Center Psychiatric Unit awaiting transfer to Anoka. Nichols was later admitted to Anoka, and then transferred to St. Peter. A psychiatrist reported that Nichols' admission to St. Peter at that time was his 19th psychiatric hospitalization. Nichols was provisionally discharged from St. Peter on August 8, 1994, approximately three months before the termination hearing. His diagnosis upon discharge was schizophrenia and alcohol dependence. St. Peter's discharge summary and aftercare plan indicated that placement in a halfway house offered the best environment for Nichols at that time.

At the termination hearing, Nichols testified that after he left St. Peter in August of 1994, he discontinued his medication. He stated that he disliked the side effects of his medication—it made him sleepy and caused a nervous "kicking" response. He also testified that he had heard voices—that God was talking to him. He stated that he had no chemical abuse problems or mental health concerns since being discharged from St. Peter, and that he was working, taking a course at South High School, and living with his mother. Nichols said he loved S.Z., wanted to be a parent to him, would take classes to improve his parenting skills, and asked to have visitation with S.Z. He stated that he would, if required, maintain a relationship with a psychiatrist, but he did not want to resume his medication.

In its order terminating Nichols' parental rights, the court listed some of Nichols' numerous hospitalizations since 1993 and the behaviors that prompted the hospitalizations, including: Nichols' claim that auditory commands caused him to make a bomb threat to City Hall; an incident in which he was found, disoriented, in an alley; a suicide attempt in December of 1993; an unauthorized absence from a chemical dependency center; and at least 41 visits to the Hennepin County Crisis Intervention Center during the prior four years. The court noted that Nichols denied having a mental illness, that he consistently refused to take his antipsychotic medications, and did not regularly visit a psychiatrist when not hospitalized. The court found that Nichols was unaware of S.Z.'s needs, noting that he estimated his 18–month–old son to be three and one-half to four years old, and he could not give any examples of activities that he would do with S.Z.

The court specifically found that Hennepin County had made reasonable efforts to prevent out-of-home placement of S.Z., including foster care for S.Z. and mental health services for Nichols through Hennepin County

Crisis Intervention Center, St. Peter and Anoka. The court also found that Nichols' denial of mental illness and refusal to consistently take his medication caused him to be at high risk for future hospitalizations, further causing him to be unavailable to care for S.Z. The court found that S.Z. would be at risk of neglect and abuse if placed with Nichols. Even though Hennepin County only argued and presented evidence on the issue of Nichols' palpable unfitness, the court terminated Nichols' parental rights on three grounds: repeated neglect to comply with the duties of the parent and child relationship, section 260.221, subd. 1(b)(2); palpable unfitness to be a party to the parent and child relationship, section 260.221, subd. (1)(b)(4); and because S.Z. was neglected and in foster care, section 260.221, subd. 1(b)(8).

Nichols appealed, claiming that the case was tried only on the theory of palpable unfitness, the statute requires that reasonable efforts be made to provide rehabilitation or reunification services, and no reasonable efforts were made to provide those services. He also claimed that the record did not support the determination of his palpable unfitness to parent S.Z. Hennepin County conceded that palpable unfitness was the only statutory ground on which evidence was presented to the district court, although it contended that the evidence presented at trial also supported other statutory grounds for termination. Hennepin County also asserted that provision of services is not a required element of a termination case based on palpable unfitness.

The court of appeals affirmed the district court, concluding that the record supported the determination of Nichols' palpable unfitness to parent. *In re Welfare of S.Z.*, 536 N.W.2d 37 (Minn.App.1995). The court also concluded that there is no requirement under section 260.221, subd. 1(b)(4) that a social service agency make reasonable efforts to either rehabilitate a parent or reunite a family. *Id.* at 39. The court concluded that "[u]nder the palpable unfitness section, however, the very nature of the parent's condition may allow for termination." *Id.* Nichols appeals, and raises two questions: first, whether, in terminating parental rights, a

social service agency must make reasonable efforts to rehabilitate a parent and to reunite a family; and second, whether termination of Nichols' parental rights on the basis of palpable unfitness was supported by clear and convincing evidence.

I.

We first address Nichols' argument that a social service agency seeking to terminate parental rights on the basis of palpable unfitness to be a party to the parent and child relationship must make reasonable efforts to rehabilitate a parent and to reunite a family. This is an issue of first impression in our court. The specific section of the Juvenile Court Act (the Act) permitting termination of parental rights on the basis of palpable unfitness, Minnesota Statute section 260.221, subd. 1(b)(4) (1994), does not mention reasonable efforts, while other grounds for termination do include the words "reasonable efforts," specifically, the sections providing for termination for abandonment, section 260.221, subd. 1(b)(1), neglect to comply with parental duties, section 260.221, subd. 1(b)(2), and a determination of neglect or dependency, section 260.221, subd. 1(b)(5).

The district court terminated Nichols' parental rights pursuant to three statutory grounds; however, a court need find only one of the statutory grounds exists to terminate parental rights. *In re R.M.M.*, 316 N.W.2d 538, 541 (Minn.1982). Nichols appeals only the termination of his parental rights on the grounds of palpable unfitness to be a party to the parent and child relationship. He argues that his rights cannot be terminated on these grounds because Hennepin County did not make reasonable efforts to rehabilitate him as a parent or to reunite him with his son.

Evaluation of this issue implicates three sections of the Act: the section relating to termination of parental rights; the section defining the purpose of the Act; and the section which defines "reasonable efforts" and sets out the requirements for juvenile court findings as to the provision of reasonable efforts. Minnesota Statute section 260.221 sets forth nine grounds on which parental rights may be terminated, including, in relevant part:

(4) That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn.Stat. § 260.221, subd. 1(b)(4) (1994).

The Act also sets out the purpose of the laws terminating parental rights, and provides:

(b) The purpose of the laws relating to termination of parental rights is to ensure that:

(1) *reasonable efforts* have been made by the social service agency to reunite the child with the child's parents in a placement that is safe and permanent;

\* \* \*

(2) \* \* \* The paramount consideration in all proceedings for the termination of parental rights is the best interests of the child.

Minn.Stat. § 260.011, subd. 2 (1994) (emphasis added).

With regard to "reasonable efforts" on the part of a social service agency, section 260.012 provides that:

(a) If a child in need of protection or services is under the court's jurisdiction, the court shall ensure that *reasonable efforts* \* \* \* are made to prevent placement or to eliminate the need for removal and to reunite the child with the child's family at the earliest possible time, consistent with the best interests, safety, and protection of the child.

(b) *"Reasonable efforts"* means the exercise of due diligence by the responsible social service agency to use appropriate and available services to meet the needs of the child and the child's family in order to prevent removal of the child from the child's family \* \* \*. The social service agency has the burden of demonstrating that it has made *reasonable efforts*.

(c) The juvenile court, in proceedings under sections 260.172, 260.191, and 260.221 shall make findings and conclusions as to the provision of *reasonable efforts*. When determining whether *reasonable efforts* have been made, the court shall consider whether services to the child and family were:

(1) relevant to the safety and protection of the child;

(2) adequate to meet the needs of the child and family;

(3) culturally appropriate;

(4) available and accessible;

(5) consistent and timely; and

(6) realistic under the circumstances.

Minn.Stat. § 260.012 (1994) (emphasis added).

Nichols argues that reasonable efforts to rehabilitate him as a parent and to reunite him with S.Z. must be provided by the social service agency even though the specific section permitting termination of parental rights because of the parent's palpable unfitness does not mention "reasonable efforts." He argues that sections 260.011 and 260.012, which recite the purpose of the laws regarding termination of parental rights and require the court to make specific findings regarding reasonable efforts, require provision of reasonable efforts in all termination cases. He also asserts that there is an inherent conflict of interest in allowing the agency which seeks to terminate parental rights to avoid providing the very services that might reunite the child with its parent. He argues that requiring the social service agency to make reasonable efforts to assist in reunification of families acts as a "counterweight" to the conflict inherent in the termination process.

Hennepin County argues that in some instances parents are palpably unfit because of conditions that no amount of services can remedy. Hennepin County cites *In re Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn. 1978), wherein this court upheld the district court's conclusion that 17 years' mental illness without remission rendered the further provision of services futile. Hennepin County rests its futility argument on the Act's

provision that the court must consider in its findings whether services to the child and the family were "realistic under the circumstances." Minn.Stat. § 260.012(c)(6) (1994). It asserts that Nichols' pattern of bizarre and often dangerous conduct makes it virtually certain that he could never be sufficiently free of his affliction to learn what would be necessary to parent S.Z., and that provision of services to him would be futile.

Mental illness, in and of itself, is not sufficient basis for the termination of parental rights. *Kidd,* 261 N.W.2d at 835. "[I]n each case, the actual conduct of the parent is to be evaluated to determine his or her fitness to maintain the parental relationship with the child in question so as to not be detrimental to the child." *Id.* If the parent remains "permanently unable" to care for the child, the rights are to be terminated. If, however, the evidence indicates that within a foreseeable time, the parent will be able to care for the child, then the district court should decline to terminate parental rights and should establish a supervised plan to give custody to the parent with whatever counseling and assistance is appropriate. *Id.* at 835–36 (citing *In re Welfare of Forrest,* 311 Minn. 11, 246 N.W.2d 854, 857 (1976)). Thus, while the nature of the parent's condition may support termination, it does not do so *ipso facto.*

The Act requires the evaluation of reasonable efforts to prevent removal of the child from the child's family and to reunite the child with the child's family in all termination of parental rights cases pursuant to section 260.221, subd. 1(b)(4). If reasonable efforts will permit a parent to become, in the foreseeable future, able to care for a child, then the provision of reasonable efforts to effect this result is mandated. Section 260.011 describes the purpose of the Act to include ensuring that reasonable efforts have been made by the social service agency to reunite the child with the child's parents in a placement that is safe and permanent. Section 260.012 specifically states that the court shall make findings regarding the provision of reasonable efforts in proceedings under section 260.221. It does not limit findings on reasonable efforts to certain subsections of

section 260.221. When these statutory provisions are considered together with the inherent difficulty of permitting the agency seeking termination also to deny rehabilitative services, it is clear that provision of reasonable efforts must be evaluated by the court in every case.

The court must make the determination of reasonableness. In some cases, any provision of services or further provision of services would be futile, and therefore unreasonable. This determination of reasonableness must be made by the court on the basis of the factors set out in Minn.Stat. § 260.012, and one of those factors is whether services are realistic under the circumstances. We conclude that when parental rights are terminated because the parent is palpably unfit to be a party to the parent and child relationship, the Act requires that the court make the determination of whether reasonable efforts have been made to rehabilitate the parent and to reunite the family, even if that determination is that provision of services for the purpose of rehabilitation is not realistic under the circumstances.

The nature of the services which constitute "reasonable efforts" depends on the problem presented. In this case, the district court found that services were provided to Nichols and that additional services would be unrealistic. Although the mental health services provided to Nichols are not the typical services directed at parenting, they are related to Nichols' ability to function as a parent. The mental health services, in light of Nichols' serious and persistent mental illness, were tailored to the problem that prevented him from being able to parent, and under the circumstances of this case, constitute reasonable efforts. As in *Kidd,* Nichols' long-term mental illness, with poor prognosis for recovery, coupled with the statements made by him which indicated his present inability to recognize his child's needs, supports the district court's determination that additional services would be futile. We agree with the district court's finding that, in this case, "[a]dditional services are not likely to bring about lasting parental adjustment enabling

the placement of [S.Z.] with Mr. Nichols within a reasonable period of time."

■ Further, the best interests of a child are not served by delay that precludes the establishment of parental bonds with the child by either the natural parent or adoptive parents within the foreseeable future. *Kidd,* 261 N.W.2d at 836. Since the best interests of S.Z. are paramount and provision of additional services to Nichols is not realistic under the circumstances, the best interests of S.Z. are not served by delaying his availability for permanent placement.

## II.

■ Nichols next argues that the termination of his parental rights on the grounds of palpable unfitness to be a party to the parent and child relationship is not supported by clear and convincing evidence. The standard of review in a termination case is whether "the findings of fact of the juvenile court are supported by substantial evidence and are not clearly erroneous." *In re Welfare of Clausen,* 289 N.W.2d 153, 156 (Minn. 1980). This court gives some deference to the district court, but closely inquires into the sufficiency of the evidence to determine whether the evidence is clear and convincing. *Id.* Minnesota Statute section 260.221, subd. 1(b)(4) permits termination of parental rights on the ground of palpable unfitness if there is: (1) a consistent pattern of specific conduct before the child or specific conditions, (2) directly relating to the parent and child relationship, (3) of a duration or nature that renders the parent unable to care appropriately for the needs of the child, (4) for the reasonably foreseeable future.

■ The district court must make clear and specific findings conforming to the statutory requirements, and the evidence must address conditions that exist at the time of the hearing. *In re Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980). The appellate court must determine whether the district court's "findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether those findings are clearly erroneous." *In re Welfare of M.D.O.,* 462 N.W.2d 370, 375 (Minn.1990). When considering termination of parental

rights, the court relies "not primarily on past history, but 'to a great extent upon the projected permanency of the parent's inability to care for his or her child.'" *In re Welfare of A.D.,* 535 N.W.2d 643, 649 (Minn.1995) (citing *In re Welfare of Solomon,* 291 N.W.2d 364, 368 (Minn.1980)). This court exercises great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result. *Kidd,* 261 N.W.2d at 835. In determining whether termination of parental rights is appropriate, the best interests of the child must be the paramount consideration. Minn.Stat. § 260.221, subd. 4 (1994); *A.D.,* 535 N.W.2d at 648 (citing *In re Welfare of J.J.B.,* 390 N.W.2d 274, 279 (Minn.1986)).

■ Nichols asserts that the findings made by the district court in his case relate primarily to his history of mental illness and do not address conditions which existed at the time of the hearing as required in *Chosa.* He claims that at the time of the hearing, he was law-abiding and sober and was supporting himself. Nichols correctly asserts that mental illness alone is not a statutory ground for termination of rights. *Kidd,* 261 N.W.2d at 835. It must be shown that the condition existing at the time of the hearing "will continue for a prolonged, indeterminate period." *Chosa,* 290 N.W.2d at 769.

At the termination hearing, the district court considered the September 1, 1993 court order committing Nichols to Anoka as mentally ill. The commitment order was stayed on specific conditions, including that he remain at Hennepin County Medical Center, take all prescribed medications, refrain from the use of alcohol and other nonprescribed drugs, and cooperate with his aftercare plan and the county social worker. The stayed order included findings by the court that Nichols was ill with chronic schizophrenia and that, as a consequence of his mental illness, he engaged in grossly disturbed behavior and posed a substantial likelihood of causing physical harm to himself and others. Nichols did not comply with the conditions of the stayed order, the court revoked the stay, and at the time Hennepin County petitioned to terminate his parental rights, Nichols was

in Hennepin County Medical Center Psychiatric Unit awaiting transfer to Anoka.

The specific conditions of the commitment order directly relating to the parent and child relationship include Nichols' long-term mental illness and polysubstance abuse. These conditions resulted in multiple hospitalizations and commitments to short- and long-term care facilities. Nichols has been unable to stop drinking, has reported auditory hallucinations, has attempted suicide, and has been detained by police after exhibiting behavior which indicated that he was a danger to himself. If Nichols cannot care for himself on a sustained basis, it follows that he cannot care for a child. Furthermore, his inability at the termination hearing to state activities which he would do with his son and his misapprehension about the child's age indicate that his mental state at the time of the hearing was not conducive to adequate child rearing. Finally, Nichols stated at the hearing that he would, if required by the court, visit a psychiatrist, but he did not intend to take his medication. These facts, viewed in the aggregate, address the first two statutory criteria: specific conditions which existed at the time of the hearing, and a consistent pattern of conduct which directly relates to the parent and child relationship. The district court's findings conform to these statutory requirements and are supported by the evidence.

The district court's findings also address the third and fourth statutory criteria regarding whether Nichols' condition is of a duration or nature that would render him incapable of caring for S.Z. for the reasonably foreseeable future. The court found that Nichols has a long history of mental illness, and that he has been diagnosed with chronic undifferentiated schizophrenia with polysubstance abuse. The court further noted his bizarre behavior in claiming that he had made bomb threats to city hall and his attempts at suicide. The court found that Nichols does not regularly visit a psychiatrist when not hospitalized and that he is unaware of his child's needs. Nichols is often unavailable due to numerous hospitalizations. His suicide attempts and his repeated visits to the crisis center implicate bizarre and potentially dangerous conduct stemming from his mental illness. As in *Kidd*, the length of time he has been diagnosed as mentally ill (since 1979), together with his announced intention to refrain from taking his medication, establish that his condition not only results in a present inability to care for his child, but also that its projected duration would result in the permanent inability to parent. We agree with the court's finding that "Mr. Nichols suffers from a mental illness which is of such a nature and duration as to render him unable for the reasonably foreseeable future to meet the ongoing physical, mental, and emotional needs of his infant son."

We conclude that the termination of Nichols' parental rights on the grounds of his palpable unfitness to be a party to the parent and child relationship is supported by clear and convincing evidence.

Affirmed.